The UNITED STATES of America,
Plaintiff-Appellee,

v.

Steven Lee GREER,
Defendant-Appellant.

No. 78–5041.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 5, 1978.

Decided Dec. 15, 1978.

Kenneth M. Weidaw, III, Grand Rapids, Mich. (Court-appointed), for defendant-appellant.

James S. Brady, U. S. Atty., J. Terrance Dillon, Grand Rapids, Mich., for plaintiff-appellee.

Before CELEBREZZE and ENGEL, Circuit Judges, and LAWRENCE, District Judge.[*]

LAWRENCE, Senior District Judge.

Appellant was convicted in 1975 by a jury on the charge of conspiracy to possess an unregistered "destructive device" in violation of the National Firearms Act.[1] He was sentenced to an indefinite term as a Young Adult Offender. His motion for new trial was overruled.[2]

Greer pleaded guilty to a bail jumping charge and received a similar sentence running concurrently with his conviction for conspiracy.

Three issues are involved in this appeal, namely:

(1) Whether the concurrent sentence doctrine should be applied with the result that the question of statutory interpretation would not be reached.

(2) Whether the explosive parts involved in this case were not as a matter of law, under a proper construction of the statute, an explosive device (as Greer contends) or whether under the National Firearms Act, as amended, they constituted (as the Government urges) a combination of parts intended for use by converting same into an explosive device.

(3) Whether the trial court's failure to give a requested instruction in respect to the effect of the defendant not taking the stand was plain error and reversible despite the lack of an adequate objection by counsel.

**I**

**Factual Background**

David Edward Haley was indicted as a co-conspirator as to the conspiracy charge. In exchange for a recommendation by the Government of probation, he pleaded guilty to misprision of a felony and testified against Greer at the trial.

Haley was the principal witness for the prosecution. He testified that he first met Greer in Detroit in July, 1974. They talked about making money through "guns and explosives and some other stuff." A lengthy conversation on that subject took place at Greer's home in that city. Haley's impression of their discussion about explosives and about the plant at which defendant had once been employed was "that there was going to be one less factory."[3]

It appears that Haley periodically purchased marijuana from Appellant which he carried to his home in Traverse City, Michigan. In January, 1975 Greer shipped marijuana to him via United Parcel Service. Haley acquired the explosives in February, 1975 to exchange for the marijuana. He was instructed by Greer to ship the parts to him via U.P.S. because it "had a low securi-

---

[*] Hon. Alexander A. Lawrence, Senior Judge, United States District Court for the Southern District of Georgia, sitting by designation.

[1] "It shall be unlawful for any person—

. . . . .

(d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record . . . ." 26 U.S.C. § 5861(d). The statutory definition of "firearm" includes a "destructive device." 26 U.S.C. § 5845(a)(8). Under 26 U.S.C. § 5845(f), "The term 'destructive device' means (1) any explosive, incendiary, or poison gas (A) bomb . . . and (3) any combination of parts . . . intended for use in converting any device into

a destructive device . . . ." This subsection specifically excludes "any device which is neither designed nor redesigned for use as a weapon."

[2] The district judge had previously denied a motion to dismiss the indictment and to suppress the evidence. See *United States v. Greer*, 404 F.Supp. 1289 (W.D.Mich.1975).

[3] On cross-examination Haley conceded that Greer never said outright that he was going to blow up the factory for insurance purposes or because he had a grudge against it. However, he did tell Haley that he entertained a grudge, according to Haley.

ty check, or something like that." Haley then shipped thirty-five pounds of explosives to Appellant at 8933 Stahlin Street, Detroit. This was a nonexistent address and the package was returned to the United Parcel Service office in Livonia, Michigan. Some of its contents were spilling out. A Loss Prevention Manager who observed same believed that the items were explosives. He communicated with the Federal Bureau of Investigation and, on examination, the package was found to contain 104 primers and 50 electrostatic master blasting caps.

An explosives specialist for the Bureau of Alcohol, Tobacco, and Firearms testified that the primers would be the equivalent of about sixty-seven pounds of dynamite. His testimony was that the package contained "all the explosive components you need" and that the blasting caps could be detonated by electric current or by impact.

## II

### The Concurrent Sentence Doctrine

Greer has appealed the conspiracy conviction but not his sentence on the plea of guilty to bail jumping. The Government urges this Court to apply the concurrent sentence doctrine and to decline to reach the merits as to statutory interpretation. See *United States v. Grunsfeld,* 558 F.2d 1231 (6th Cir.), *cert. den. sub nom. Flowers v. United States,* 434 U.S. 872, 98 S.Ct. 219, 54 L.Ed.2d 152 (1977); *United States v. Burkhart,* 529 F.2d 168 (6th Cir. 1976).[4]

Application of the concurrent sentence rule is discretionary. *Ethridge v. United States,* 494 F.2d 351 (6th Cir.) *cert. den.* 419 U.S. 1025, 95 S.Ct. 504, 42 L.Ed.2d 300 (1974).

This appeal presents a significant question of statutory construction as to which there is a diversity of view in other Circuits. Under the circumstances, we decline to apply the rule relative to review of a concur-

rent sentence imposed in another and related case which was not appealed by the defendant.

## III

### Destructive Devices under the National Firearms Act

The definition of firearm in 26 U.S.C. § 5845(a) includes a "destructive device." The term is dealt with or defined in three different subsections. Under subsection (f)(1) such a device encompasses bombs, grenades, rockets, missiles, mines, and similar devices. Subsection (f)(2) deals with large-bore weapons other than sporting guns.

Subsection (f)(3) includes "any combination of parts . . . intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled." The subsection last referred to is the key to the principal issue, namely, whether a package containing primers and blasting caps is a destructive device intended for use by converting same into such a device. The Government contends, as earlier noted, that the primers and blasting caps sent to Greer represented a "combination of parts . . . intended for use in converting" same into an explosive bomb.

What has produced the dichotomy in other Circuits is whether intent is a relevant factor in determining if component parts constitute a destructive device under § 5845(f).

The trial court charged the jury that the use for which the materials are intended determines whether they constitute a destructive device. After defining such devices in terms of the statute, the district judge gave the following instruction:

"Thus, you, as jurors, must decide whether the 35 pounds of dynamite caps, fuses, which the Government charges Mr. Greer with having agreed to possess, was a destructive device.

*Gentry v. United States,* 533 F.2d 998 (6th Cir. 1976). Such may be particularly true of an indeterminate sentence imposed pursuant to the Young Adult Offender Act.

---

**4.** "[I]t is well understood that a multiplicity of sentences impairs a prisoner's opportunities for pardon or parole." *Hibdon v. United States,* 204 F.2d 834, 839 (6th Cir. 1953). See also

With respect to the types of materials involved in this case, the statute has been interpreted to mean that it is the use for which these materials are intended which determines whether they fall within the meaning of the term destructive device.

Dynamite fuses and caps may be used for legitimate purposes. They may also be frequently used in criminal activities, as in an explosive bomb.

It is up to you as members of the jury to determine what was intended to be the use of the commercial dynamite within the box. If you find the defendant intended to use the 35 pounds of dynamite and 50 blasting caps and wires for a commercial or industrial purpose or other legal purpose, then I instruct you there is no destructive device within the cardboard box."

## IV

### Legislative History

The legislative history of the section of the statute which is involved in the present appeal was outlined by the Second Circuit in *United States v. Posnjak,* 457 F.2d 1110 (2d Cir. 1971). In reviewing the history of the legislation the Court said:

"The statutory provisions under which appellant was convicted were enacted in 1968, as part of a Congressional attempt to stem the traffic in dangerous weapons being used in an increasing number of crimes involving personal injury. In June of that year, Congress passed, as Title IV of the Omnibus Crime Control and Safe Streets Act, Pub.L.No.90–351, 82 Stat. 197, amendments to the criminal provisions on firearms, 18 U.S.C. § 921 *et seq.,* to regulate the transfer and sale of firearms by licensed dealers to persons thought likely to misuse them. These provisions were deemed unsatisfactory to accomplish their purpose, however, and later in 1968 the Gun Control Act was passed, Pub.L.No.90–618, 82 Stat. 1213, further amending Title 18 and revising the National Firearms Act, 26 U.S.C. § 5801 *et seq.,* which dealt with registration and taxation of certain highly dangerous weapons, such as machine guns. 'Destructive devices,' included in the definition of 'firearms' for the first time in the Crime Control Act, were somewhat redefined and were included in the provisions of both titles." See 457 F.2d at 1113.

The background of the statutory scheme is reviewed in an annotation on explosive devices in 25 ALR Fed 351–53. The expressed purpose of the National Firearms Act of 1968 was "to strengthen the firearms provisions which had been enacted as part of the omnibus crime bill." 1968 *U. S. Code Congressional and Administrative News,* p. 4412. Congress was well aware of the result of the use of converted military type weapons as well as the street varieties of homemade instruments. It intended to outlaw both types. See *United States v. Peterson,* 475 F.2d 806, 810 (9th Cir.) *cert. den.* 414 U.S. 846, 94 S.Ct. 111, 38 L.Ed.2d 93 (1975).

The Omnibus Crime Control Act of 1968 and the amendment to the Firearms Act later that year regulate "destructive devices." 18 U.S.C. § 921(a)(4); 26 U.S.C. § 5845(f). "The term 'destructive device' is defined to mean dangerous bomb and incendiary-type weapons . . . ." 1968 *U. S. Code Congressional and Administrative News,* p. 4416. Each of the statutes exempts "certain devices from the definition of 'destructive device.' The devices excluded are those not designed or redesigned or used or intended for use as a weapon—e. g. construction tools using explosives when used for such purposes . . . ." *Id.* 4418. "Simply stated, a device may be 'converted' into a destructive device as defined in Subparagraphs (1) and (2) by way of 'design or intent.' See S.Rep.No.1501, 90th Congress, 2d Sess., P. 47 (1968)." *United States v. Oba,* 448 F.2d 892, 894 (9th Cir. 1971) *cert. den.* 405 U.S. 935, 92 S.Ct. 979, 30 L.Ed.2d 811 (1972).

## V

### The Conflict in the Circuits

In *United States v. Dalpiaz,* 527 F.2d 548 (6th Cir. 1975) this Court dealt with 26

U.S.C. § 5845(f). Defendant was indicted and convicted for knowing possession of an unregistered firearm, namely, a ground burst projectile simulator. It was decided in *Dalpiaz* that such did not constitute a destructive device within the meaning of (f)(1) which specifically refers to bombs, grenades, rockets, missiles and similar devices.[5] "[F]or purposes of determining whether the device comes within the statutory exclusion," said this Court, "purpose is irrelevant." That statement was merely intended, however, to differentiate (f)(1) (which was the subsection dealt with in that case) from subsection (f)(3) with which the present is concerned.

Subsection (f)(1) which was relied on by the Government in *Dalpiaz* is, as stated, directed to bombs, grenades, rockets and certain missiles or "similar devices." All of these are objectively identifiable devices. On the other hand, (f)(3) concerns a different type of destructive device—one that consists of a combination of constituent parts which may be readily assembled for intended use as a bomb or destructive device.

We think that *United States v. Dalpiaz* is distinguishable. The decisions in other Circuits come factually closer to the mark than *Dalpiaz*. Sharp divergence of opinion has arisen outside the Sixth Circuit.

In *United States v. Posnjak, supra,* 457 F.2d 1110, the Government contended that although commercial dynamite is not *per se* covered by the statute, it is subject to regulation and registration when the transferee intends to use same as a "destructive device."[6] The trial court so instructed the jury. The Second Circuit reversed the judgment of conviction. In doing so it said:

"The legislative history suggests strongly, then, that Congress was con-

cerned in the National Firearms Act mainly with clearly identifiable weapons which were the cause of increasing violent crime and which had no lawful uses, and that the intent of the user of these weapons was irrelevant, as they were so prone to abuse that they were considered *per se* dangerous and unnecessary for legitimate pursuits. Congress did not mention or deal with possible unlawful uses of otherwise legitimate devices, but concentrated on objectively identifiable weapons of war and 'gangster-type weapons.'" At 1116.

*Posnjak* held that only combinations which produce a device described in (1) and (2) are covered by the law and that unless the device is specifically specified in either of those subsections the object involved cannot be imported into (f)(3) on the theory of the ultimate subjective intent of the possessor so as to transform it into a prohibited device. *Id.* 1117.

In *United States v. Morningstar,* 456 F.2d 278, *cert. den.* 409 U.S. 896, 93 S.Ct. 135, 34 L.Ed.2d 153 (1972) the Fourth Circuit reached a different conclusion—as opposite to *Posnjak* "as the Antipodes are unto us, Or the South to the Septentrion," to use the Bard's phrase. In that case the Court ruled that the sticks of black powder and the blasting caps constituted a "destructive device" as defined in 26 U.S.C. § 5845(f) and its counterpart in the Gun Control Act of 1968, 18 U.S.C. § 921(a)(4)(C), since the material represented a combination of parts which could readily be assembled for intended use as a bomb. Congress had provided that the use for which the materials are intended determines whether they fall within the Act. "We believe," continued the Fourth Circuit in *Morningstar,* "the legislative history is not so conclusive on [the matter of intent] that it shows a congres-

---

**5.** In contending that the ground burst projectile simulator is a destructive device, the Government appears to have based its case on the definition in 26 U.S.C. § 5845(f)(1) pertaining to a "missile" having an explosive or incendiary charge of more than one-quarter ounce, and the language therein or "similar device."

**6.** In that case an undercover agent expressed to Posnjak an interest in acquiring dynamite, stating that he wanted to procure it for a Cuban revolutionary group which intended to "blow up buildings and people." The agent obtained from him 100 sticks as a sample. Thereafter an order was placed for 4,000 sticks. Posnjak was arrested when he delivered the dynamite, fuses and caps.

sional intention to restrict the commonly accepted meaning of bombs and weapons to those employed by gangsters or to military ordnance." 456 F.2d at 281.

In *United States v. Oba, supra,* 448 F.2d 892, in concluding that the object was a destructive device, the Ninth Circuit made the sweeping statement that "In light of the nature of this device and its admitted purpose, its seems absurd to even question its inclusion within the definition of 'destructive device' approved by Congress, or to assert that it is not a weapon." [7]

The decision in *Oba* was followed by the Eighth Circuit in *Langel v. United States,* 451 F.2d 957, 962 (1971). Still another Circuit, the Seventh, has joined the procession. Pointing out the conflict that exists on the issue of whether the possession of commercial explosives can be includable in the statutory definition of a destructive device, it concluded that "the better view is that set forth in *Langel,* the majority opinion in *Oba,* and *Morningstar." Burchfield v. United States,* 544 F.2d 922, 924 (7th Cir. 1976).

 As to these numerous judicial interpretations, the First Circuit commented in *United States v. Curtis,* 520 F.2d 1300, 1302–03 (1975): "Among the confusing welter of cases construing section 5845(f) perhaps the only principle universally adhered to is that the garden-variety dynamite charge is not itself subject to regulation under the National Firearms Act." [8] The decided preponderance of the decisional law interpreting the subsection in controversy lies on the side of the jurisdictions holding that an explosive device may consist of parts intended for use in converting same into a combination which will constitute such a device.

We agree with that conclusion.

Appellant raises no question as to the sufficiency of the evidence in Greer's case. The trial court's instructions were correctly presented as to the statutory definition of an explosive device and in regard to factors underlying the jury's determination of the issues.

Appellant's conviction on the charge of conspiring to possess a non-registered destructive device was authorized under our interpretation of the statute involved.

## VI

### Failure to Charge on Effect of Defendant's Failure To Testify

 Counsel for Greer seasonably requested in writing the following instruction:

"Every defendant in a criminal case has the absolute right not to testify. The defendant has no obligation to testify or to prove his innocence in any matter. You are not permitted to consider his silence for any purpose and his silence must not influence your verdict in any manner whatsoever."

Through inadvertence, the trial judge overlooked the requested instruction. After the jury retired, the Court entertained objections to the charge. Counsel for defendant stated: "Except as previously requested in my written request, the only objections to the charge would be that I believe the definition of reasonable doubt— I'm also entitled to an instruction that reasonable doubt may grow out of a lack of evidence."

Greer's counsel contends on appeal that the failure to give the requested charge, even in the absence of proper objection,

---

**7.** The destructive device in *Oba* consisted of seven sticks of dynamite bound by copper wiring, a fuse, and blasting caps. "Combination" as used in (f)(3) means an association of the components, at the same time and place, and not an actual union of parts into an assembled device. *United States v. Davis,* 313 F.Supp. 710 (D.Conn.1970).

**8.** "The statutory purpose would be ill-served by an interpretation which excluded from coverage 'home-made' bombs having no lawful use simply because one of the components was dynamite, a material not in itself regulated as a firearm. Thus, while gasoline, bottles and rags all may be legally possessed, their combination into the type of homemade incendiary bomb commonly known as a Molotov cocktail creates a destructive device." *Curtis,* 520 F.2d at 1304.

constitutes reversible error. The failure to give such an instruction is erroneous. *Bruno v. United States,* 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939); *Lakeside v. Oregon,* 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978). However, it does not amount to plain error. *United States v. Williams,* 521 F.2d 950, 172 U.S.App.D.C. 290 (1975). The objection here obviously lacked the specificity required by Rule 30, F.R.Crim.P. See *United States v. Prujansky,* 415 F.2d 1045 (6th Cir. 1969); *United States v. Bender,* 218 F.2d 869 (7th Cir.) *cert. den.* 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253 (1955).

The record reflects that at the hearing on Greer's motion for new trial his counsel frankly conceded that he did not object to the omission for tactical reasons. In other words, if he insisted on his objection to the failure to charge and the trial judge undertook to correct the oversight, to so instruct the jury at that point might emphasize to the jury the fact that Greer had not taken the stand. However, if counsel did not press the matter, his client could claim plain error on appeal.

We find no reversible error in the failure to give the requested instruction. The judgment of the district court is affirmed.