NOT RECOMMENDED FOR PUBLICATION
**File Name: 06a0340n.06**
**Filed: May 12, 2006**

No. 04-1756

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| AUBREY WINN, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| PAUL H. RENICO, Warden, | ) | |
| | ) | OPINION |
| Respondent-Appellee, | ) | |
| | ) | |
| | ) | |
| | ) | |

**Before: MOORE, SUTTON, Circuit Judges; and BUNNING, District Judge.***

**DAVID L. BUNNING, District Judge.** Petitioner Aubrey Winn, appeals a district court judgment dismissing his petition for a writ of habeas corpus. Petitioner was convicted in Michigan state court of second degree murder, assault with intent to commit murder, and possession of a firearm during the commission of a felony. He was sentenced to two concurrent terms of 24-80 years for the murder and assault convictions, and a consecutive term of 2 years for the firearm conviction. Winn subsequently pleaded guilty to second

---

*The Honorable David L. Bunning, United States District Judge for the Eastern District of Kentucky, sitting by designation.

degree murder in an unrelated case, and was sentenced to another term of 24-80 years to run concurrently with the other two.[2]

In his petition, Winn asserted that his Sixth Amendment rights were violated when the trial court admitted the preliminary testimony of two witnesses who were not produced at trial.[3]  For the reasons that follow, we **AFFIRM** the district court's dismissal of Winn's petition for a writ of habeas corpus.

## I.  FACTUAL BACKGROUND & PROCEDURAL HISTORY

The events giving rise to this case transpired on the evening of January 10, 1998 at a multi-family dwelling located at 2753-2755 West Buena Vista, in Detroit, Michigan.  (JA 250).  At that time, Petitioner was living at the Buena Vista residence[4] along with several members of his family, including:1) his sister, Akeva Winn, her boyfriend, Darry West,[5] and Ms. Winn's two children; 2) his cousin, Jacqueline Taylor, her boyfriend, Rory Groves,[6] and Ms. Taylor's four children; and 3) his brother, Harold Winn,[7] and his girlfriend, Valena

---

[2]Winn agreed to plead guilty on the condition that he would be sentenced to a term not longer than the sentence imposed for his murder and assault convictions.

[3]Winn's notice of appeal was construed as a request for a certificate of appealability, and raised the same issues that were presented to the district court.  Those issues were: 1) whether the trial court erred in refusing to accept his guilty plea, and 2) whether the trial court erred in admitting the preliminary testimony of two witnesses who were not produced at trial.  Only the second issue was certified for appeal.

[4]The residence was described as a brick, two-family dwelling that had an upper and lower flat, with separate entrances.  (JA 276).

[5]Mr. West was also known as "Floss" (JA 431), and "Carlos" (JA 374).

[6]Mr. Groves was also known as "Roe."  (JA 431).

[7]Mr. Winn was also known as "Jefferson Earl Thomas."  (JA 371).

Jordan.  (JA 287-302).[8]  Petitioner occupied the basement of the dwelling, which was partially finished.  (JA 303).

Late in the evening on the night of January 10, Petitioner walked upstairs to the bedroom that Ms. Taylor shared with her boyfriend, Rory Groves.  (JA 308).  Petitioner had recently returned home from attempting to run an errand for Ms. Taylor, and was upset that his efforts were in vain.[9]  (JA 308-309).  When he approached her, Ms. Taylor was on the telephone; so Petitioner began playing with her dog.  (JA 309).  The dog, a German Shepherd-pit bull puppy, became excited and Ms. Taylor (still on her call) left the room to avoid the noise.  (JA 309).  Shortly thereafter, Ms. Taylor heard her puppy crying.  (JA 310-11).  She put the phone down and returned to her bedroom, to find Petitioner choking the puppy.  (JA 311).

Rory Groves then entered the room and confronted Petitioner.  (JA 311).  A fight between the two men ensued.  During the scuffle, Petitioner reached into his back pocket, pulled out a .38 caliber handgun, and shot Mr. Groves several times.  (JA 427).  Mr. Groves survived.  Petitioner then attempted to flee the residence.  (JA 428).  According to Petitioner, when he reached the lower flat, Darry West approached him and attempted to wrest the gun out of his hand; the gun discharged accidentally, killing Mr. West.  (JA 428).

After the shootings, Petitioner sought refuge at the home of his cousin, Brian

---

[8]Another family member, by the name of Mika Jones, also lived at the Buena Vista residence with her boyfriend, who was only known as "Dray."  (JA 302).

[9]Ms. Taylor asked Petitioner to pick up her daughter at a designated place, but her daughter was not there.

Henderson. (JA 427). The following afternoon, January 11, 1998, Petitioner surrendered to the Detroit Police. (JA 434).

Petitioner was interrogated by Sergeant Ernest Wilson of the Homicide Division. (JA 397). During the course of the interrogation, Petitioner admitted to firing the shots that killed Mr. West and injured Mr. Groves. (JA 427-28). He alleged, however, that the gun discharged accidentally when Mr. West attempted to pry it from his hand, and he shot Mr. Groves in self-defense.[10] (JA 427-29).

Petitioner was charged with: 1) premeditated murder for the death of Darry West (count 1), 2) assault with the intent to commit murder for the shooting of Rory Groves (count 2), and 3) possession of a firearm during the commission/attempted commission of a felony (count 3). (JA 99).

On July 14, 1999, after a three-day trial, the jury rejected Petitioner's version of events and convicted him of second-degree murder, assault with intent to commit murder, and felony firearm possession. (JA 563). The Michigan Court of Appeals affirmed Petitioner's conviction, and on May 5, 2001, the Michigan Supreme Court denied his petition for further review.

On November 27, 2002, Winn filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 alleging that the trial court erred in: 1) refusing to accept his guilty plea, and 2) admitting the preliminary examination testimony of two witnesses, where

---

[10]According to Petitioner's statement to Sgt. Wilson, while he and Mr. Groves were struggling on the couch, he thought he saw Groves reach toward the side of the couch. (JA 427). Petitioner knew that Groves owned a .38 caliber gun, and thought he was trying to grab it. (JA 433).

-4-

the prosecution failed to exercise due diligence in attempting to locate them and produce them at trial, in violation of his Sixth Amendment right of confrontation. (JA 8-10).

The district court denied the petition in its entirety, concluding that: 1) the Michigan Court of Appeals' ruling that the trial court properly rejected Petitioner's guilty plea was reasonable, and 2) the trial court's determination that the prosecution made reasonably diligent efforts to locate the particular witnesses was a reasonable determination of the facts. (JA 72-86). A certificate of appealability was granted as to Petitioner's Confrontation Clause claim.

## II. ANALYSIS

In this case, the Court is called upon to determine: 1) whether the "concurrent sentence" doctrine precludes review of Petitioner's Confrontation Clause claim, and 2) whether Petitioner's Sixth Amendment right of confrontation was violated when the trial court admitted the preliminary examination testimony of two witnesses who were not produced at trial.

Petitioner argues that the district court properly analyzed his Confrontation Clause claim within the framework articulated in *Crawford v. Washington*, 124 S. Ct. 1354 (2004), but failed to apply *Crawford's* more stringent holding on the issue of "unavailability." Alternatively, Petitioner claims that if *Crawford* is inapplicable, the prosecution nevertheless failed to exercise "reasonable, timely, and good faith efforts to properly locate key witnesses," whose out-of-court statements were then improperly deemed admissible.

As a preliminary matter, Respondent points out several flaws in Petitioner's argument, including: 1) *Crawford* was not the "law of the land" at the time the final state court rendered its decision and is, therefore, inapplicable to this case, 2) the district court

did not apply *Crawford*, and 3) *Crawford* did not redefine or restrict the test for determining "unavailability" in Confrontation Clause challenges. Substantively, Respondent argues that the Court should decline review of Petitioner's Sixth Amendment claim pursuant to the "concurrent sentence" doctrine. Alternatively, Respondent maintains that the trial court properly concluded that the prosecution's efforts to locate the missing witnesses were reasonable.

In his reply brief, Petitioner argues that the following facts militate against application of the "concurrent sentence" doctrine: 1) Respondent failed to raise it at the district court level, 2) there is a possibility of adverse collateral consequences, and 3) the Court has been reluctant to invoke the doctrine (which is completely discretionary) to dispose of substantive challenges to convictions.

### A.     Standard of Review

The Court reviews a district court's legal conclusions in a habeas proceeding *de novo,* and its factual findings for clear error. *Vincent v. Seabold,* 226 F.3d 681, 684 (6th Cir. 2000).

Because Winn filed his petition for habeas relief after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), the provisions of that Act apply to this case.

Pursuant to the AEDPA, a federal court may not grant a writ of habeas corpus for any claim that was adjudicated on the merits in state court, unless the state court's adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable

-6-

determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Court] on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the decision of the Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

A state court's decision is an "unreasonable application" of clearly established Supreme Court precedent when the state-court decision correctly identifies the governing legal standard but applies that standard to the facts of the case before it in an objectively unreasonable manner. *Id.* at 409-10.

An unreasonable application of federal law is different from an incorrect application of federal law, and a federal court may not issue a writ of habeas corpus simply because the federal court concludes that the state court erroneously applied clearly established federal law. *Id.* at 411.

### B.    "Concurrent Sentence" Doctrine

Initially, the Court must address Respondent's argument that, because Petitioner pleaded guilty to murder in an unrelated case and is serving a concurrent sentence that is equal to the sentences that stem from the murder and assault convictions in this case, the Court may decline Petitioner's request for review under the "concurrent sentence" doctrine.

According to this doctrine, which has been accepted by this Court, an appellate court may decline to hear a substantive challenge to a conviction when the sentence on the challenged conviction is being served concurrently with an equal or longer sentence on a

valid conviction. *See United States v. Jeter*, 775 F.2d 670 (6th Cir. 1985), *cert. denied*, 475 U.S. 1142 (1986).

Although the Court has been admittedly hesitant to apply this doctrine, *United States v. Greer*, 588 F.2d 1151, 1154 (6th Cir. 1978), *cert. denied*, 440 U.S. 983 (1979), *citing Hibdon v. United States*, 204 F.2d 834, 839 (6th Cir. 1953), it has invoked it when there is no possibility of adverse "collateral consequences" if the convictions stand. *United States v. Stewart*, No. 84-1084, unpub. op., 782 F.2d 1044 (6th Cir. 1985), *citing Benton v. Maryland*, 395 U.S. 784 (1969); *United States v. Maze*, 468 F.2d 529 (6th Cir. 1972).

In the present case, Petitioner contends that, if upheld, his convictions could have a potentially adverse effect on: 1) his future sentencing options, and 2) administrative issues related to his confinement (i.e., housing options, security level, and work options). Petitioner also argues that Respondent effectively waived the issue by not raising it at the district court level.

Because Respondent raises the "collateral sentence" doctrine for the first time on appeal, we decline to address it now. *See City of Detroit v. Simon,* 247 F.3d 619, 630-31 (6th Cir. 2001).

### C.    Confrontation Clause Violation

Petitioner's sole argument on appeal is that his Sixth Amendment right of confrontation was violated when the trial court admitted the preliminary examination testimony of two witnesses who were not produced at trial. In particular, he claims that the prosecution did not satisfy its burden of proving that the witnesses were unavailable.

The test for evaluating Confrontation Clause claims was originally set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980). In *Roberts*, the Supreme Court articulated a two-pronged test for determining the admissibility of a declarant's out-of-court statement:

> [First], the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Id.* at 66.

The second prong was recently abrogated with respect to testimonial statements by *Crawford v. Washington*, 541 U.S. 36 (2004), where the Court held that testimonial out-of-court statements by witnesses are barred under the Confrontation Clause, unless: 1) the witnesses are unavailable, and 2) the defendant had a prior opportunity to cross-examine them, regardless of whether such statements are deemed reliable.[11] *Crawford*, however, does not apply retroactively. *Dorchy v. Jones*, 398 F.3d 783, 788 (6th Cir. 2005).

In *Roberts*, the Court explained that "a witness is not 'unavailable' for purposes of ... the exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his [or her] presence at trial." 448 U.S. at 74, *citing Barber v. Page*, 390 U.S. 719, 724-725 (1968).

The "good faith" test has lent itself to certain general propositions, including:

---

[11]This change in the law was noted by the district court. (JA 81-82). The court also noted, however, that *Crawford* did not alter the "unavailability" analysis, which is at issue in this case. (*Id.*). Moreover, any change effected by *Crawford* would not be applicable to the facts of Petitioner's case because it occurred nearly two years after the final state court decision was rendered. *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004) ("[R]eview is conducted in light of the law as it existed at the time of the final state court decision ...").

[I]f no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation.

*Roberts*, 448 U.S. at 74.

The lengths to which the prosecution must go to produce a witness, however, is a question of reasonableness. *California v. Green*, 399 U.S. 149, 189, n.22 (1970) (concurring opinion, *citing Barber v. Page*, *supra* ). The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. *Roberts*, 448 U.S. at 74. The prosecution bears the burden of proof in this regard. *Id.* at 74-75.

### 1. Challenged testimony

Petitioner challenges the trial court's admission of Rory Groves' and Valena Jordan's preliminary examination testimony. The preliminary examination was held on February 12, 1998, (JA 446), and Groves and Jordan testified as follows:

Direct examination (Rory Groves):

Q: Tell us your name, sir.

A: Rory Groves.

Q: Are you also known as Rory Grove Williams, or is that part of your name at all?

A: No, it's not.

Q: So, it's Rory Groves?

A: Yes.

Q: Thank you. Mr. Groves, are you familiar with the address of 2753-2755 Buena Vista in the City of Detroit?

A: Yes.

Q: Back on January 10, 1998, did you live there?

A: Yes.

Q: Did you live in the upstairs or the down – did you live in the downstairs or the upstairs?

A: Upstairs.

Q: Were you upstairs on January 10th, 1998, at about 11:00 p.m.?

A: Yes.

Q: Do you own a dog?

A: Yes.

Q: What kind of dog?

A: A Pit Bull mixed with German Shepherd.

Q: Was that dog in the upstairs on that date and time?

A: Yes.

Q: Did something happen between your dog and the defendant in this case, Aubrey Winn?

A: Yes.

Q: What did you see happen between the defendant and your dog?

A: My dog was barking at him, and he started choking my dog.

Q: When the defendant started choking your dog, how did you react?

-11-

A: I got up and asked him to quit choking my dog, and I grabbed at his shoulder, and he punched me.

Q: After you did that, what happened?

A: We started tussling. I fell to the floor, and he started strangling me.

Q: Were other people upstairs then, if you know.

A: Yes.

Q: While this was going on, what happens next?

A: After he strangled me, we both got up and I heard four gunshots.

Q: Could you tell me where the gunshots were coming from?

A: Yes.

Q: Where were they coming from?

A: They were coming from Aubrey Winn.

Q: Where was the gun pointed at at that time?

A: It was pointed at me.

Q: How far away from you was he?

A: Two feet.

Q: Did you have any sort of weapon at all?

A: No.

Q: Then where were you struck by the bullets?

A: I was struck in the collar bone, the bottom part of my stomach, and two in my chest.

Q: When you were shot, did you lose consciousness?

A: No.

-12-

Q:  After you were shot those times, what do you remember happening next?

A:  I remember my girlfriend coming in and asking me if I was all right. I told her, "yeah." After she asked me that, I heard three gunshots downstairs. I came out, I went outside my room, and Aubrey Winn came back upstairs saying that Carlos was dead. I was telling Aubrey Winn not to shoot him.

Q:  What did the defendant do then?

A:  He left. He ran.

Q:  Were you taken to the hospital?

A:  For a week.

Q:  Do you have any permanent effect from those bullet wounds?

A:  No. I just be itching where I was shot at.

Q:  Thank you.

Cross-examination (Rory Groves):

Q:  Mr. Groves, I understand that there was a struggle, right, and you indicated that at some point Mr. Winn was on top of you and he was choking you?

A:  Yes.

Q:  What were you doing?

A:  Trying to get loose.

Q:  How were you trying to get loose?

A:  I was grabbing his hands, punching him.

Q:  Okay. This was a fight, right?

A:  Yes. I was trying to save my life.

Q:  While you were fighting, you were made (sic), weren't you?

-13-

A: Yes, because it didn't have to happen.

Q: But you were angry, right?

A: Yes.

Q: Were there any words being exchanged between you and Mr. Winn?

A: No.

Q: You didn't say anything? You didn't say, "Let me up," or anything like that?

A: No.

Q: You were just punching and –

A: Trying to get loose. I couldn't talk. I couldn't breathe.

Q: So, he let you up, right?

A: No. His family got him off.

Q: But he let you up. He physically released himself from you, correct?

A: Yes.

Q: And you were on the mattress at that point?

A: Yes.

Q: And you moved to the sofa, right?

A: After I was shot, yeah.

Q: You turned towards the soft (sic), is that correct, sir?

A: After I was shot, yes.

Q: You do carry a .38, don't you?

A: No.

Q: Sir, on January 1st, on New Year's Eve, weren't you at the house firing shots with a .38?

-14-

A:     No.

Q:     You got shot in the shoulder?

A:     Yes.

Q:     In the thigh – I'm sorry, the stomach?

A:     In the stomach.

Q:     Thank you.

Direct examination (Valena Jordan):

Q:     Tell us your name, ma'am.

A:     Valena Jordan.

Q:     Ms. Jordan, are you familiar with the address 2753-2755 Buena Vista in the

       City of Detroit?

A:     Yes.

Q:     Were you at that address on January 10th, 1998, at around about 11:00

       p.m.?

A:     Yes.

Q:     Do you know a person by the name of Aubrey Winn?

A:     Yes.

Q:     Earlier that evening, had he taken you to the store?

A:     Yes.

Q:     After he brought you to the store, did you go back to the address on Buena

       Vista?

A:     Yes.

Q:     Were you in the upstairs or the downstairs?

A:     The downstairs.

Q:     Were you still around the house around 11:00 p.m.?

A:     Yes.

Q:     Were you awake or asleep at the time?

A:     Sleep.

Q:     Did something wake you up?

A:     Yes.

Q:     What woke you up?

A:     Jackie said –

Q:     So, you heard Jackie's voice?

A:     Yes.

Q:     Based on hearing her voice, did you do anything?

A:     I got up and I went to Mika's room.

Q:     Where is Mika's room?

A:     In the back by the bathroom, across from Akeva's room.

Q:     Is it in the upstairs or the downstairs?

A:     The downstairs.

Q:     While you were doing that, did you hear any other noise?

A:     No.

Q:     Did there come a time when you heard shots?

A:     Yeah.

Q:     Where were the shots coming from as best you could tell?

A:     Upstairs.

Q: When you heard shots, what did you do?

A: I walked – I stepped out of Mika's room and was going towards the kitchen.

Q: What happened then?

A: Darry ran past me.

Q: What is the person's full name?

A: Darry West.

Q: So, then, when you saw Darry West, he went past you, you said?

A: Yeah, he was running past me.

Q: Did you continue to look in his direction when he went past you?

A: Yes.

Q: Did you see anything happen to Darry.

A: I seen him fall to the ground. He was shot.

Q: He fell to the ground when he was getting shot?

A: He was getting shot, but he said "No!" Then he got shot, then he fell to the ground. Then I ran back to Mika's room.

Q: Could you tell where the shots that Darry suffered were coming from?

A: The dining area. It was like the kitchen and the dining area.

Q: Did you see anybody with a gun?

A: No.

Q: After Darry fell, what did you do?

A: I ran in Mika's room?

-17-

Q:     Thank you.[12]

The prosecution introduced the transcript of this testimony at Petitioner's trial.

### 2.     Evidence presented at "due diligence" hearing

Petitioner claims that the trial court erred in admitting this testimony, over objection, because the prosecution failed to establish the requisite "good faith" in attempting to locate the witnesses. In particular, Petitioner alleges that the prosecution's efforts were "too little, too late." The state trial court conducted a "due diligence" hearing on July 13, 1999, where Sgt. Wilson, the officer in charge of the case, summarized his efforts to locate Rory Groves, Valena Jordan, and Harold Winn.[13] (JA 393-97, 436-47).

Sgt. Wilson testified that he received the subpoenas on July 1, 1999 and started compiling the witness' addresses the following day.

On July 5, he went to 15030 Greenlawn, Apartment 6, looking for Ms. Jordan and Mr. Winn. He was unable to locate them, but did speak to a young lady by the name of Sandra Watkins. Ms. Watkins, who lived in Apartment 5, informed Sgt. Wilson that Jordan and Winn had moved out two weeks earlier.

Sgt. Wilson then went to 1945 Monterey and spoke to an African American male by the name of James Murdock, who was also a resident of that house.[14]

---

[12]JA 450-59. Although Jordan was available for cross-examination, no questions were asked on cross-examination.

[13]Harold Winn was initially identified as a witness, but did not testify at the preliminary examination.

[14]It is unclear whether Sgt. Wilson was referring to the house on Greenlawn or the Buena Vista residence.

On July 6, he went to Technicolor, which was Ms. Jordan's last known place of employment, where he was informed that Ms. Jordan had not been employed there since March 1999.

He also spoke to Patricia Williams at the Family Independence Agency, who informed him that a grant was opened for Ms. Jordan the previous month. Ms. Williams gave Sgt. Wilson an address of 3817 Monterey, a phone number, and a contact person by the name of Mrs. Crenshaw. He spoke to Mrs. Crenshaw by phone and followed up in person on July 7. Mrs. Crenshaw denied knowing Ms. Jordan.

He also spoke to other individuals in the vicinity of the Monterey address, none of whom had seen Valena Jordan or Harold Winn.

On July 6, Sgt. Wilson went to Petitioner's mother's home located at 17387 Fairport based upon reports from family members that Ms. Jordan and Mr. Winn were staying there. He spoke to Ms. Winn, who denied knowing Harold, and left the subpoenas in the mailbox.

Finally, he tried contacting Ms. Jordan and Mr. Winn by telephone.

With respect to Mr. Groves, Sgt. Wilson went to his grandmother's home in Highland Park[15] on July 5. He went back to that address every day until the trial started one week later, on July 12, 1999.

Sgt. Wilson also went to Groves' mother's residence. No one was home, but he did speak to Groves' uncle, who lived next door. Sgt. Wilson left a copy of the subpoena, as well as his business card bearing his telephone number, with Groves' uncle, but no further contact was made.

_____

[15]This was the same address where he had previously served Jacqueline Taylor and Akeva Winn. (JA 439).

He checked with the utility companies for any contact information (address, telephone number, etc.), the county jail, and the morgue, to no avail.

Finally, Detroit Police units surveiled Petitioner's mother's home on two different occasions for approximately19 total hours.

### 3.     Discussion

Petitioner attacks the sufficiency of these efforts on several grounds.

First, he argues that the prosecution was dilatory in preparing, and Sgt. Wilson was dilatory in serving, the subpoenas, which were not issued until less than two weeks before the trial was scheduled to begin.[16]

Second, he notes that, despite Sgt. Wilson's efforts, the subpoenas were never personally served on the witnesses.

Finally, Petitioner argues that the prosecutor should have known and, in fact, acknowledged in his opening statement that these witnesses would be particularly difficult to produce and would "demand special attention."[17]  (Pet. Brief, p. 24).

In sum, Petitioner claims that "[t]he belated efforts to locate and produce these witnesses, *while somewhat extensive*, did not meet the standard of due diligence."  (*Id.*) (emphasis added).

---

[16]Petitioner also contends that this delay was inexcusable, as the trial date had been set for nearly four months.  On a related note, Petitioner did not go to trial until approximately 17 months after the date of the bind-over.  He claims that "[t]he passing of so long a period of time should place any reasonable prosecutor on notice that a witness may have changed residences or would otherwise become difficult to locate."

[17]Because they were either relatives or close friends of Petitioner.

Petitioner relies, in large part, on this Court's decision in *United States v. Quinn*, 901 F.2d 522 (6th Cir. 1990). Petitioner's reliance on *Quinn*, however, is misplaced. In that case, the defendant was convicted in federal court of possession with intent to distribute cocaine. At trial, the Government introduced testimony given by the defendant's girlfriend, Sharon Braxton, at an earlier suppression hearing. *Id.* at 525. This testimony was the only evidence offered by the Government that connected the defendant to the athletic bag in which the cocaine was found, and placed him in the apartment before the arrest. *Id.* at 526. The jury ultimately returned a guilty verdict, and the defendant was sentenced to 63 months incarceration and 3 years of supervised release. *Id.*

On appeal, the defendant argued that the district court erred in admitting the transcript of Braxton's suppression hearing testimony because the Government failed to lay a proper foundation, i.e., demonstrate that Braxton was unavailable to testify at trial. *Id.*

In response, the Government presented the testimony of two U.S. Marshals regarding the efforts that were made to locate Sharon Braxton and present her at trial. *Id.* at 524. First, Officer Robert O'Banner testified that the subpoena for Braxton was issued on Wednesday, March 29, 1989, and received by his office the following day. *Quinn*, 901 F.2d at 524. O'Banner considered this fairly short notice, explaining that the Marshals normally like at least five working days to locate a witness. *Id.*

O'Banner testified that on Thursday, March 30, he went to 3194 Steele, Number 1, the address provided by Braxton at the suppression hearing, but was unable to gain access to the building. *Id.* He testified that he was able to determine which apartment was

Number 1, and pounded on the window. *Id.* He testified that he did not get a response, but was unsure if anyone was there.

On Friday, March 31, O'Banner returned to the complex. No one was in the manager's office, but O'Banner was able to access the corridor with the help of an employee. *Id.* at 524-25. He pounded on, and left a U.S. Marshal sticker on, the apartment door. *Id.* at 525.

Finally, O'Banner testified that on Monday, April 3, the first day of trial, he went back to the apartment. No one was home, but he did talk to a woman washing her vehicle, who informed him that Braxton had moved away about one month earlier. *Quinn*, 901 F.2d at 525.

The Government also called Officer Cash, who testified that he had been tied up in federal court the week before trial, and did not have the time to go out and try to locate Braxton over the weekend. *Id.*

Cash testified that he had received information on the night of April 3 that Sharon was living with her mother (Beula Braxton) at 261 Keel, Apartment 3. *Id.* He went out to the address on the night of April 3 at 12:30 a.m. *Id.* Cash verified that Sharon's car was still registered in her name, but testified that he did not see it when he drove by her mother's home. *Id.*

Officer Cash also testified that at approximately 7:45 a.m. on Tuesday, April 4, he placed a call to the residence, and spoke to an elderly female, who identified herself as Beula Braxton. *Id.* Ms. Braxton advised Officer Cash that Sharon was not there, but was expected back later that evening. *Quinn*, 901 F.2d at 525. Officer Cash did not inform Braxton's mother why he was looking for her. *Id.*

Over objection, the district court concluded that, based upon the officers' testimony, the Government demonstrated a "good faith" effort to locate and present Sharon Braxton at trial.  *Id.*

This Court disagreed, noting that even though the "good faith" and "reasonableness" requirements of *Roberts* are not subject to exact definition, it was clear that the Government's efforts were insufficient.  *Id.* at 528.

In support, the Court seized on the following deficiencies: 1) the subpoenas were received on the Thursday before the Monday trial, and no efforts were made during the intervening weekend; 2) Officer Cash drove by Braxton's mother's home, but did not stop or call that evening; and 3) no county or city records were checked, no one followed up with the manager of the apartment building regarding a forwarding address, and no efforts were made to contact Braxton's relatives or possible employers.  *Id.*

The Government's efforts were criticized as "negligible" and "singularly unenthusiastic," especially in light of the fact that Braxton was a key witness in its case against the defendant.  *Id.*

The facts that informed the Court's decision in *Quinn* are not present in this case.

First, and foremost, Sgt. Wilson undertook precisely those efforts that the officers in *Quinn* neglected.  He pursued leads concerning forwarding addresses; spoke to neighbors, family members, and former employers; checked utility records, the local jail, and the morgue; contacted a state agency from which one of the witnesses was known to be receiving assistance; and conducted several hours of surveillance on locations where the witnesses were likely to be found.

Second, although Sgt. Wilson received the subpoenas only seven working days before the trial began, it does not appear that his efforts were, in any way, hampered by a lack of time within which to locate the subject witnesses. *See Tate*, 1995 WL 27505 at *8 (stating, "a proper inquiry into reasonable, good faith efforts requires a court to look at all the facts, including when the government initiated efforts to contact absent witnesses"). This is in stark contrast to *Quinn*, where this Court reasoned that the efforts were "negligible, perhaps due in part to the unreasonable time constraints placed upon the Marshal's office." *Quinn*, 901 F.2d at 528.

Finally, unlike Sharon Braxton, Rory Groves and Valena Jordan were not "key witnesses" in the prosecution's case against Petitioner. Several other witnesses testified regarding the events that transpired on the night of January 10, 1998, including Jacqueline Taylor, Akeva Winn, and Sgt. Wilson, who testified regarding the admissions Petitioner made during interrogation.

For all these reasons, the Court concludes that the prosecution, in association with the Detroit Police Department, made a good faith effort to locate Valena Jordan and Rory Groves, and present them at trial.

The trial court properly determined that the witnesses were "unavailable" prior to admitting their preliminary examination testimony. Petitioner's Confrontation Clause claim is, therefore, without merit.

### III. CONCLUSION

Based on the foregoing, the Court concludes that the decision of the Michigan Court of Appeals was neither contrary to, nor an unreasonable application of, the Supreme Court's decision in *Ohio v. Roberts*. Moreover, the decision was not based upon an

unreasonable determination of the facts in light of evidence presented during the "due diligence" hearing. The decision of the district court denying Petitioner's request for federal habeas relief is, therefore, **AFFIRMED**.