**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0664n.06

**Nos. 09-1921, 09-1922 & 09-2244**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Oct 28, 2010**

LEONARD GREEN, Clerk

| | |
|---|---|
| JESSIE WAYNE PILLETTE, | ) |
| | ) |
| Petitioner-Appellant Cross-Appellee, | ) |
| | ) ON APPEAL FROM THE UNITED |
| v. | ) STATES DISTRICT COURT FOR THE |
| | ) EASTERN DISTRICT OF MICHIGAN |
| MARY BERGHUIS, | ) |
| | ) |
| Respondent-Appellee Cross-Appellant. | ) |

Before: BATCHELDER, Chief Judge; MOORE, and COOK, Circuit Judges.

COOK, Circuit Judge. Petitioner Jessie Wayne Pillette sought habeas relief from several state convictions, claiming that (1) the prosecution violated his Fifth Amendment rights by using his post-arrest silence against him, and then his trial counsel violated his right to effective assistance of counsel by failing to object to the violation; (2) the state trial court violated his confrontation rights under the Sixth Amendment by improperly admitting into evidence the preliminary examination testimony of an adverse witness; and (3) his trial counsel rendered ineffective assistance by failing to call several witnesses to testify on his behalf, failing to introduce evidence, and failing to impeach the credibility of a key prosecution witness. The district court rejected the first two claims but granted conditional relief on the third, ordering the state to take steps to re-try Pillette within 90 days

or release him from custody.  Rather than re-try Pillette, the state released him.  The district court subsequently entered an order barring re-prosecution.  Both sides appeal.

I.

A Michigan jury convicted Pillette of assault with intent to commit murder, two counts of felonious assault, and three counts of carrying a weapon with unlawful intent, stemming from his involvement in a series of altercations on August 31, 2003 at the trailer park where he resided.

The prosecution's witnesses explained that at a large social gathering—in attendance at various times were Pillette, Anthony Kuzia, Megan Kimbler, Rick Duarte, Tara Bowron, Shannon Brower, Mary Barrette, Melissa Siirila, and three stepbrothers, Charles Bell, Dennis Washington, and Quavis Roby—Pillette grew increasingly agitated and belligerent, cursing those in attendance, throwing a beer, and attempting to instigate a fight.  He eventually picked a fight with Washington, which, after an exchange of words, escalated to physical violence when Pillette hit Washington in the mouth.  Washington fought back, and the ensuing fistfight left Pillette badly beaten.  In Washington's version, the fistfight ended when Kuzia grabbed him from behind, freeing Pillette to run up the porch steps and arm himself with a baseball bat.  Pillette returned and, standing within striking distance, faked a swing at Washington, but Bowron stood between the two and prevented Pillette from swinging.  Then, according to Washington, Pillette said, "I'm goin' to get my F...in' gun," and ran back into the trailer.

Roby testified that he followed Pillette into the trailer and twice asked him whether he was all right. After the second query, Pillette picked up the shotgun and pointed it at him, at which point Roby fled. At trial, he conceded that he did not know whether Pillette actually pulled the trigger. Those present reported hearing several gunshots (when exactly during this sequence the shots were heard is not at all clear, nor particularly relevant).

At Pillette's preliminary examination, Brower testified that she remained at the trailer shared by Duarte and Kimbler while the fight was going on, but watched Roby approach the back door of Pillette's trailer and say, "You don't need a gun, man. You don't need a gun." She then saw the barrel of a gun she believed to be a shotgun sticking out of the door and heard the gun produce an audible click. Shortly thereafter, Roby came running to Duarte's trailer, purportedly complaining that Pillette had pointed a gun at him. Asked during the preliminary examination whether anything but the gun could have produced the click, Brower said, "It could have been. It could have been a rock. It could have been anything." Because police could not locate her after several attempts, she did not testify at Pillette's trial. Instead, over the defense's objection, the prosecutor read Brower's preliminary examination testimony into the record at trial.

Siirila, who around the time of the gunshots was inside Duarte's trailer, testified that after hearing a young woman (apparently, Barrette) claim to have been shot, she went outside to check on the woman when Pillette approached her from behind and grabbed her shoulder, knocking her

to the ground. Siirila claimed that Pillette pointed the gun at her and threatened to kill her.[1]
According to Siirila, Kuzia yelled out something along the lines of "The niggers [meaning Washington, Bell, and Roby] are down here," and Pillette took off running in Kuzia's direction, toward the entrance to the trailer park.

Pillette, testifying as the lone witness in his defense, told a different story. He testified that Washington, Bell, and Roby had arrived uninvited and unwanted,[2] and that Kuzia, Duarte, and Kimbler all asked him to say something to the group to get them to leave. Pillette claimed that as he lost his footing, Washington hit him, to which Pillette responded, "Let's do this, then, Nigger," and punched Washington back. At that point, Roby joined in the fracas on Washington's behalf. According to Pillette, Washington bounced him off of the trailer, a nearby car, and onto the ground, where Washington and others punched and kicked him repeatedly. Washington began choking Pillette from behind, and Roby hit Pillette in the face with a rock. Pillette testified that Kuzia eventually succeeded in pulling his attacker[3] off of him, and after breaking free, he ran into the trailer, grabbed a baseball bat, and went back outside. Pillette then asked Kuzia for "the keys," which were hanging in the kitchen, intending to lock up the trailer. The key chain that held the key to the front door also contained the key needed to unlock the gun cabinet.

---

[1]In her trial testimony, Siirila could not recall exactly whether Pillette used the word "shoot" or "kill" when threatening her.

[2]On cross-examination, Pillette conceded that Kuzia had invited the three into the trailer when the gathering moved indoors.

[3]At this point in his testimony, it is unclear whether Pillette referred to Washington or Roby.

Back inside the trailer, Pillette fell to the floor, dizzy, and nearly passed out. Then, after hearing the sound of windows breaking, Pillette unlocked the gun cabinet, which contained guns belonging to Kuzia. According to Pillette, Kuzia assembled and loaded a .20 gauge shotgun, while Pillette grabbed a .22 caliber rifle, which he struggled to load. After dropping a bullet on the floor, Pillette eventually succeeded in chambering a single round. He went outside the trailer and fired a warning shot into the air, but then noticed that everyone (meaning Washington, Roby, and Bell) was already gone. According to Pillette, he heard Barrette screaming, and approached her to see if she was injured. He then returned to the house to load the .22, but soon left to look for Kuzia outside, where he eventually passed out in an empty lot next to the road. Pillette maintains that, throughout the entire episode, he fired only the single warning shot with the .22 rifle. He testified to hearing other gun shots that sounded like they came from a .22, and suggested that Kuzia kept another .22 caliber weapon—a handgun—in the trailer. Pillette denied ever pointing a gun at Siirila or Roby, or ever even possessing the shotgun, but admitted that he "did have a gun."

The police arrived, responding to reports of gunshots at the trailer park, and, after obtaining Kuzia's consent, searched the trailer. They found the shotgun, the .22 rifle, ammunition for both weapons strewn about, and two wooden baseball bats. Outside the trailer, they found a third baseball bat (this one aluminum), as well as a spent .22 caliber shell casing that matched the rifle. Inspection of the .22 revealed a bullet jammed in the chamber. The shell found in the chamber of the shotgun bore a marking on the primer consistent with the firing pin.

An ambulance transported Pillette to the emergency room where they took x-rays and treated him for minor cuts and bruises. Officer Cavanaugh described Pillette's condition at the time as "highly intoxicated" and "somewhat irate." For his part, Pillette admitted to drinking "[p]robably more than thirty" beers. After police advised him of his Miranda rights, Pillette gave a statement indicating that he had been "jumped" by a group of "niggers." He stated that no shots were fired and denied having a rifle. He also told police—he claims in jest—that "the only good nigger is a dead nigger." At trial, Pillette expressly stated that he never asked for a lawyer while the police were questioning him.

The jury found Pillette guilty of all the charges. For the assault with intent to commit murder conviction, the trial court imposed a 48-year[4] maximum sentence with a 12-year minimum; Petitioner also received terms of 2 to 4 years for the each of the felonious assaults and 2 to 5 years for each of the weapons charges, to be served concurrently with the lengthier assault with intent to murder sentence.

Pillette appealed his conviction to the Michigan Court of Appeals, claiming, through his appellate counsel, that his trial counsel provided constitutionally ineffective assistance by failing to object to Officer Cavanaugh's expert testimony on weapons and ballistics issues, and by failing to object to the prosecution's purported violation of Pillette's Fifth Amendment right to remain silent. In a supplemental brief filed pro se, Pillette asserted an ineffective assistance claim premised on

---

[4]Respondent's brief states the maximum as 24 years, but this conflicts with the sentencing transcript from state court, as well as the Michigan Court of Appeals opinion.

counsel's failure to call witnesses. His brief did not identify what witnesses his counsel should have called, but he attached a copy of Duckett's police statement to his filing. Pillette's pro se supplement also asserted the Confrontation Clause violation stemming from the admission of Brower's preliminary examination testimony. The additional exhibits attached to the supplement included a police report discussing the theft of a .22 caliber gun from Pillette's residence, as well as police reports indicating that the other men involved in the altercation had previously stolen or discharged weapons in the same trailer park where the incident occurred. The Michigan Court of Appeals denied relief. *People v. Pillette*, No. 254587, 2005 WL 1399312 (Mich. Ct. App. June 14, 2005). Pillette filed a pro se motion for reconsideration, in which he asserted that trial counsel led him to believe that Kimbler, Duarte, Barrette, Duckett, and Kuzia would be called to testify in his defense. The court of appeals denied the motion (Dist. Ct. Doc. ("Doc.") 1-3 at 28), and the Michigan Supreme Court denied leave to appeal. *People v. Pillette*, 711 N.W.2d 305 (Mich. 2006).

At the conclusion of his direct appeal, Pillette returned to the trial court and filed a post-conviction motion for relief from judgment raising three new claims (not at issue here), which the court denied. He then filed a habeas petition in the Eastern District of Michigan, and the court stayed proceedings to allow him to exhaust his state remedies. The Michigan Court of Appeals rejected his appeal from the denial of post-conviction relief, *People v. Pillette*, No. 270513 (Mich. Ct. App. Nov. 28, 2006), and the Michigan Supreme Court denied leave, *People v. Pillette*, 731 N.W.2d 751 (Mich. 2007).

Returning to the federal courts, Pillette sought a writ of habeas corpus on grounds that (1) trial counsel's failure to object to the alleged Fifth Amendment violation deprived him of constitutionally effective assistance; (2) the trial court violated his Confrontation Clause rights by admitting Brower's preliminary examination testimony; and (3) trial counsel rendered ineffective assistance by failing to: call favorable witnesses, introduce a police report about an allegedly stolen gun, and impeach Roby with evidence of a prior conviction. The district court granted an evidentiary hearing on the third claim, finding that Pillette "made a reasonable attempt to fairly present" his claims to the state courts, and that those claims, "if true, would entitle him to habeas relief." *Pillette v. Berghuis*, No. 2:06-14511, at *6 (E.D. Mich. July 28, 2008) (internal quotation marks and citation omitted).

Pillette and his trial attorney, James Deamud, testified at the federal evidentiary hearing. Deamud recalled little about his work on the case. He testified that "in this type of a case" he usually relied on the prosecutor to find witnesses, and that the individuals involved were a transient bunch (and thus difficult to locate). Deamud testified that the statement Duckett—Pillette's then-girlfriend—made to police "was somewhat inconsistent with almost all the rest of the stories," and that such discrepancies, coupled with the obvious potential bias, led him to conclude that Duckett's credibility issues seriously undermined her potential usefulness as a witness. He also explained that he did not believe the evidentiary rules allowed him to utilize for impeachment purposes Roby's convictions for receiving and concealing a firearm and malicious destruction of property under $200. Told by Pillette's habeas counsel that some of the uncalled witnesses could have helped Pillette's

defense because they provided statements indicating that they heard only one gunshot, Deamud explained that:

> [t]he issue over the number of gunshots did not seem to be a particularly important issue. One, nobody was actually accused of shooting at anybody. Two, there was a lot of excitement going on. There was a lot of alcohol going on. And it didn't strike me as odd that one person would hear one and one would hear three.

On re-cross, the state's attorney pointed to Pillette's trial testimony that he "fired one shot, but . . . heard more than one shot myself too." And when he took the stand, Pillette acknowledged that he testified at trial to hearing multiple gunshots. In addition, Pillette testified that Deamud assured him that Barrette, Duarte, Duckett, and Kimbler had been subpoenaed to appear at trial, and that the police reports about the stolen .22 and Roby's prior conviction would be used in his defense.

In an opinion and order issued June 19, 2009, the district court rejected Pillette's first two claims, finding them without merit, but granted a conditional writ on the third claim, which encompassed seven separate elements of trial counsel's purportedly defective assistance: the failure to call Duckett, Barrette, Duarte, Kimbler, and Kuzia, the failure to introduce the police report about the theft of the .22, and the failure to impeach Roby using his prior convictions. *Pillette v. Berghuis*, 630 F. Supp. 2d 791 (E.D. Mich. 2009) (hereinafter "Dist. Ct. Merits Op."). The order stated that "unless the state takes action to afford petitioner a new trial within ninety days of the date of this opinion, he may apply for a writ ordering respondent to release him from custody forthwith." *Id.* at 807.

On September 17, 2009, Respondent filed a notice confirming its compliance with the conditional writ, indicating that the Michigan Department of Corrections released Pillette from custody on that date. Nevertheless, the very next day, the district court (acting sua sponte) entered an order stating that "[b]ecause the State of Michigan has failed to comply with the terms of the conditional writ, an unconditional writ of habeas corpus shall issue in this case." *Pillette v. Berghuis*, 683 F. Supp. 2d 518, 519 (E.D. Mich. 2009). The court ordered that the Otsego County Circuit Court's March 8, 2004 judgment of conviction be vacated and the record of conviction expunged. And finding that the State of Michigan "offered no excuse . . . for its failure to timely cure the error caused by taking steps to bring petitioner back to the Otsego County Circuit Court for a new trial," and that allowing the state "to reprosecute petitioner would amount to an unconscionable windfall to the State of Michigan and would essentially reward them for their noncompliance with this Court's orders," the court barred Pillette's re-prosecution. *Id.*

II.

We review the district court's legal conclusions de novo and its factual findings for clear error. *Hill v. Hofbauer*, 337 F.3d 706, 710 (6th Cir. 2003). Pillette's petition is subject to the requirements of AEDPA because he filed it after April 24, 1996. *Carter v. Mitchell*, 443 F.3d 517, 524 (6th Cir. 2006). Accordingly, he may not obtain relief unless the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). An adjudication is "contrary" to federal law when the court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "decides a case differently than [the Supreme] Court has on . . . materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). And "[a] state court unreasonably applies Supreme Court precedent 'if the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular prisoner's case.'" *Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003) (quoting *Williams*, 529 U.S. at 407). Pursuant to 28 U.S.C. § 2254(e)(1), we presume the correctness of a state court's factual findings unless the petitioner rebuts them with clear and convincing evidence. *Sinkfield v. Brigano*, 487 F.3d 1013, 1016 (6th Cir. 2007).

III.

The district court granted a certificate of appealability to allow us to consider two claims it rejected: (1) that trial counsel's failure to object to the alleged Fifth Amendment violation deprived him of constitutionally effective assistance; and (2) that the trial court violated his Confrontation Clause rights by admitting Brower's preliminary examination testimony.

A.      Fifth Amendment - Violation of Right to Remain Silent

Pillette argues that the prosecutor violated his constitutional rights by questioning a police witness about Pillette's post-Miranda silence and by commenting on this silence in arguments to the jury.  Acknowledging that his counsel did not object to the prosecutor's conduct, Pillette asserts that this failure constituted ineffective assistance.

Pillette's appellate counsel raised (and the Michigan Court of Appeals decided) this claim in his direct appeal, so we evaluate the claim under AEDPA's deferential standard.[5]

"[B]ecause the *Miranda* warnings contain an implicit assurance that 'silence will carry no penalty,' it would be fundamentally unfair to allow a prosecutor to use a defendant's post-*Miranda* warnings silence to impeach the explanation he offered at trial." *Franklin v. Bradshaw*, 545 F.3d 409, 415 (6th Cir. 2008) (quoting *Doyle v. Ohio*, 426 U.S. 610, 618 (1976)).  Accordingly, "*Doyle* bars the use against a criminal defendant of silence maintained after receipt of government assurances." *Anderson v. Charles*, 447 U.S. 404, 408 (1980).  But *Doyle* does not apply where the defendant does not invoke his right to remain silent because "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Id.*

The Michigan Court of Appeals held that Pillette never invoked his right to remain silent. Deputy Cavanaugh testified that he read Pillette the *Miranda* warnings and Pillette agreed to

---

[5]Respondent argued procedural default on this claim below, but the district court did not rely on it, and Respondent does not renew the argument here.

continue speaking with him, and proceeded to make several statements. Specifically, Pillette told Cavanaugh that "he didn't point a gun at nobody and . . . didn't shoot at nobody." Cavanaugh further testified that, after a while, Pillette became "uncooperative," a comment Pillette seizes on here to suggest that Cavanaugh referenced his refusal to speak. But in his testimony, Cavanaugh clarified that "uncooperative" referred to Pillette's repeated use of racial slurs during the interview. Although Pillette testified at times that he "didn't tell the police anything," he also acknowledged making statements about how many shots he heard and denying pointing a gun at anyone. Pillette has not presented clear and convincing evidence to rebut the state court's factual finding that he never invoked his right to silence.

Although Pillette insists the prosecutor asked him several questions on cross-examination from which the prosecutor intended "to draw meaning from silence" (an impermissible purpose under *Doyle*) rather than "to elicit an explanation for a prior inconsistent statement" (a permissible purpose under *Doyle*), *Anderson*, 447 U.S. at 408, this argument overlooks the preliminary inquiry whether *Doyle* applies. *Doyle* does not apply here because, as the state court found, Pillette never invoked his right to remain silent.

Because Pillette himself admitted giving statements to police, he cannot demonstrate clear error in the state court's determination that he never invoked his right to remain silent. Thus, the state court's rejection of Pillette's Fifth Amendment claim did not involve an unreasonable application of clearly established federal law. The district court correctly denied relief on this claim.

B.      Sixth Amendment - Violation of Confrontation Clause

Pillette asserts that the introduction of Brower's preliminary examination testimony at his trial violated his Confrontation Clause rights.

The Sixth Amendment secures a criminal defendant's right "to be confronted with the witnesses against him." U.S. Const. amend. VI. "Thus, the prosecution may not substitute former testimony for live testimony unless the government first demonstrates that the witness remains unavailable for trial proceedings." *Hamilton v. Morgan*, 474 F.3d 854, 858 (6th Cir. 2007). This exception to the Confrontation Clause requires establishing that (1) the testimony to be used was given at a prior judicial proceeding against the same defendant and was subject to cross-examination, *Crawford v. Washington*, 541 U.S. 36, 54 (2004); and (2) the government undertook a good faith effort to secure the presence of the unavailable witness at trial, *Ohio v. Roberts*, 448 U.S. 56, 74 (1980), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36, 60-68 (2004). Pillette challenges the state court's unavailability finding, arguing that the police failed to undertake good faith efforts to find Brower before trial. "A good-faith effort, however, is not an ends-of-the-earth effort, and the lengths to which the prosecution must go to obtain a witness generally amount to a question of reasonableness." *United States v. Cheung*, 350 F. App'x 19, 23 (6th Cir. 2009) (internal quotation marks, citations, and alterations omitted).

Two officers—Cavanaugh and Crane—testified to their considerable efforts aimed at tracking down Brower, who had moved away from the area without leaving a forwarding address.

They looked up the address on her driver's license and drove out to the physical location, only to find that it did not exist. They inquired with the other witnesses who knew her, as well as with the local postmaster, but learned only that she had relocated to Howell, Michigan—more than 200 miles away—and still had an active P.O. Box in Vanderbilt. They ran a statewide computer search for any recent police contacts, but turned up nothing. And they managed to locate Brower's father in Hillman, Michigan (more than 50 miles away), and left a phone message that went unreturned.

Although the state trial court expressed some reservations about the belated nature of a portion of the efforts undertaken to secure Brower's presence (some of which did not occur until just before trial), the court found that they satisfied the police's good faith obligations, and the Michigan Court of Appeals affirmed. Pillette fails to cite any cases suggesting that the Michigan courts unreasonably applied clearly established federal law in reaching that conclusion. Moreover, under the circumstances, the reasonableness of the police department's efforts is readily apparent. They pursued numerous independent avenues in their efforts to find Brower, and Officer Cavanaugh testified that the search they undertook in this case exceeded their typical investigation. And though Pillette suggests that they could have done more, such as driving out to Brower's father's house rather than just leaving him a message, the police possessed no facts suggesting that Brower had any contact with her father, and indeed had it on good information that she was living several hundred miles away in Howell—but where, in Howell, they had no idea, despite diligent efforts to find out. The law does not require such "ends-of-the-earth" efforts of the police.

Pillette also argues that the trial court erred by admitting Brower's preliminary examination testimony because it lacked adequate indicia of reliability. But this argument utilizes a standard the Supreme Court overruled in *Crawford*. *See Davis v. Washington*, 547 U.S. 813, 825 n.4 (2006) (recognizing that *Crawford* overruled this aspect of *Roberts*); *see also United States v. Moncivais*, 492 F.3d 652, 659 n.3 (6th Cir. 2007). Under *Crawford*, testimonial statements like Brower's are admissible as long as the defendant received a prior opportunity for cross-examination. 541 U.S. at 53–54. And since Pillette does not dispute that the preliminary examination afforded him the opportunity to cross-examine Brower, his Confrontation Clause claim lacks merit.

Finally, Pillette contends that the court's failure to sequester Brower prior to her preliminary examination testimony compounds the alleged Confrontation Clause violation. But the district court properly analyzed this as a separate claim apart from the Confrontation Clause; whether or not Brower remained in the courtroom in violation of a sequestration order before testifying at the preliminary examination has no bearing on the *Crawford* inquiry, i.e., whether the trial court properly found her unavailable for trial or whether her testimony was subject to cross-examination. Addressing it separately, the district court correctly rejected the claim. The Michigan Court of Appeals did not unreasonably apply federal law in concluding that the trial court's discretionary decision not to bar Brower from testifying at the preliminary examination did not supply a basis for granting habeas relief.

IV.

Respondent appeals the grant of the writ on ineffective assistance grounds, arguing that none of the seven bases referenced by the district court—the failure to call each of the five witnesses, introduce the police report regarding the stolen gun, and impeach Roby with his prior conviction—demonstrate a constitutional infirmity in counsel's performance.

To establish ineffective assistance of counsel, Pillette "must show that counsel's performance was deficient," and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "[D]eficient performance" means that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. In evaluating reasonableness, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged conduct might be considered sound trial strategy." *Id.* at 689 (quotation marks and citation omitted). Prejudice, in this context, requires showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact entitled to de novo review. *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000).

As a threshold matter, we note that although the petition complains of counsel's failure to *call* witnesses, the district court's analysis (and eventual grant of relief) mostly concerned what it deemed a failure by counsel to *investigate*. The court found that despite counsel's vague recollection that he talked to some witnesses, he could not remember which witnesses he spoke with and his file contained no notes of witness interviews. It faulted trial counsel for "fail[ing] to present adequate evidence that he ever interviewed any of these potential witnesses." Dist. Ct. Merits Op., 630 F. Supp. 2d at 800. This finding, coupled with its legal statement that "[w]here a defense counsel fails to investigate and interview promising witnesses, and therefore has no reason to believe they would not be valuable in securing a defendant's release, counsel's inaction constitutes negligence, not a trial strategy," led the court to conclude that "counsel was deficient for failing to adequately investigate or interview these witnesses." *Id.*

Critically, however, nowhere in the state courts or in his petition for habeas corpus did Pillette assert a claim that counsel failed to investigate witnesses. Rather, Pillette's claims at all times focused on the failure to call witnesses, a separate and distinct claim. *See English v. Romanowski*, 602 F.3d 714, 2010 WL 1488354 at *10–12, (6th Cir. Apr. 15, 2010) (treating failure to call and failure to investigate as analytically distinct). Moreover, even after the court ordered an evidentiary hearing and appointed counsel to represent Pillette, counsel's initial briefing did not mention a failure to investigate witnesses. *See* Doc. 26.[6] Only in supplemental briefing filed after

---

[6]Counsel's brief complains of trial counsel's failure to investigate the police report about the stolen .22 (Doc. 26 at 4) and the prior acts of some of witnesses, including Roby (*id.* at 2, 5), but never about failing to investigate the witnesses' statements.

the evidentiary hearing occurred, and even then only in the most cursory manner, did counsel begin

to suggest that the claim involved a failure to investigate witnesses. *See* Doc. 48.[7] In any event,

regardless of when the concept first arose in the federal court proceedings, it is not properly before

this court on appeal because Pillette never gave the state courts any opportunity to address it. A

petitioner procedurally defaults "by failing to raise a claim in state court, and pursue that claim

through the state's 'ordinary appellate review procedures.'" *Williams v. Anderson*, 460 F.3d 789,

806 (6th Cir. 2006) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 846–47 (1999)). So to the extent

the district court issued the writ based on such a claim, it did so in error. Accordingly, we limit our

review of Pillette's witness-related claims to counsel's failure to call the witnesses to testify at trial,

not to any purported failure to interview them. Respondent also asserts that Pillette procedurally

defaulted four of the five failure-to-call witness claims, but we decline to resolve those procedural

default issues and instead turn directly to a discussion of the merits.


    A.    Failure to Call Witnesses

The failure to call favorable witnesses can amount to ineffective assistance where it results

in prejudice to the defense. *See, e.g.*, *Towns v. Smith*, 395 F.3d 251, 258–60 (6th Cir. 2005) (counsel

ineffective for failing to call a witness who could have created an alternative theory of the case). But

"[a] defense counsel has no obligation to call or even interview a witness whose testimony would

---

[7]In the eight-page section of the supplemental brief discussing the failure-to-call claim, Pillette's counsel uses the word 'investigate' only once, and then only in a general description of the claim. The substantive discussion of each of the five witness claims never mentions a failure by counsel to investigate what those individuals knew or would have testified to.

not have exculpated the defendant." *Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004) (quotation marks and citation omitted).

    i.    Lacey Duckett

Before addressing the merits of Pillette's claim involving counsel's failure to call Duckett as a witness, we first must determine the proper standard of review. Citing *Brown v. Smith*, 551 F.3d 424, 428–29 (6th Cir. 2008), the district court concluded that "[i]n light of the fact that the state courts failed to conduct an evidentiary hearing on petitioner's ineffective counsel claims and limited their review to 'mistakes apparent on the record,' petitioner's ineffective assistance of counsel claims were never truly adjudicated on the merits, for purposes of applying the deferential standard of review contained in § 2254(d)." 630 F. Supp. 2d at 797. Thus, the district court applied de novo review to the claim involving Duckett, and to the other four witness claims as well.

The district court misinterpreted *Brown*, and, as a result (at least with respect to the Duckett claim) erred in applying de novo review. In *Brown*, the court refused to apply AEDPA deference because the state courts never adjudicated the petitioner's claim on the merits. The Michigan Court of Appeals did not have before it the evidence forming the basis for the petitioner's claim and in its decision "explicitly acknowledged that its review was limited to mistakes apparent on the record." *Brown*, 551 F.3d at 429 (quotation marks and citation omitted). Neither factor relied on by the court in *Brown* is present in this case. Petitioner attached Duckett's witness statement to his pro se supplement, and the Michigan Court of Appeals did not, expressly or otherwise, limit its review of

this claim to mistakes apparent on the record, but, in fact, clearly resolved the Duckett claim on the

merits using the same evidence—Duckett's statement to police—Pillette presented in federal court.

2005 WL 1399312, at *4. Where the state court adjudicates a claim on the merits, the deferential

review called for by AEDPA applies. *McElrath v. Simpson*, 595 F.3d 624, 630 (6th Cir. 2010).

Turning to the merits of the claim that his counsel performed ineffectively by failing to call

Duckett as a witness, Pillette argues (and the district court found while erroneously applying de novo

review) that Duckett's testimony would have supported Petitioner's contentions that Washington,

Roby, and perhaps Bell jumped him, that he fired only a single shot, and "would have contradicted

Siirila's testimony that petitioner had threatened to kill her." Dist. Ct. Merits Op., 630 F. Supp. 2d

at 799.

After reviewing Duckett's statement, the Michigan Court of Appeals concluded that Pillette:

> was not deprived of a substantial defense because the statement provided no clear
> alibi for defendant when considering it in conjunction with the evidence presented
> at trial, including defendant's testimony. Duckett's statements in the report were not
> totally consistent with defendant's testimony, and this may have been the reason
> defense counsel did not call her as a witness. Moreover, there is no error apparent
> from the record with respect to defense counsel's failure to call Duckett. Defendant
> has not overcome the presumption that defense counsel's decision not to call the
> witnesses was a matter of strategy. This Court will not second-guess counsel in
> matters of trial strategy.

2005 WL 1399312, at *4.

In rejecting this claim, the state court did not unreasonably apply clearly established federal law. Although the district court's improper de novo assessment of Duckett's utility as a witness identified some potential helpfulness to the defense, the strategic decision counsel made not to call her at trial did not amount to performance below the constitutionally-adequate threshold. The Michigan Court of Appeals identified one valid reason not to call Duckett—her account conflicted with Pillette's in some respects, *see id.*—and the federal evidentiary hearing turned up at least one other—inherent bias, and concomitant credibility issues, stemming from the fact that she was Pillette's girlfriend, *see* Doc. 72 at 46–47. Under AEDPA's deferential standard, these reasons for not calling Duckett, standing independently, suffice to protect counsel's decision from second-guessing by this court. In combination, along with the strong presumption that counsel's conduct fell within the range of reasonable professional assistance, they illustrate with clarity that counsel's decision not to call Duckett did not render his representation constitutionally deficient. Because the Michigan Court of Appeals did not unreasonably apply *Strickland* in rejecting this claim, we must defer. Accordingly, we reverse the district court's decision to grant the writ based on counsel's failure to call Duckett.

      ii.     Mary Barrette

Unlike the claim involving Duckett, which the state court confronted on the merits, the four other witness claims never received a merits-adjudication from the state courts, and thus warrant de

novo review. *See Dorn v. Lafler*, 601 F.3d 439, 442 (6th Cir. 2010) ("Where there was no state-court adjudication on the merits of a habeas claim, we review that claim de novo.").

Pillette's counsel deposed Barrette during the federal court proceedings and submitted her testimony at the evidentiary hearing. The district court concluded that Pillette's counsel was ineffective for failing to call Barrette because she "would have corroborated petitioner's testimony that he did not point a gun at Melissa Siirila." Dist. Ct. Merits Op., 630 F. Supp. 2d at 797. The district court's evaluation of Barrette's testimony hinges on its understanding that "Barrette was with Siirila at the time [Pillette allegedly assaulted Siirila] and did not witness any assault against Siirila"—a statement the district court explains "was known early in the case, from the summary of Barrette's information in a memorandum written by Officer Crane." *Id.* at 798. This point is crucial because unless Barrette and Siirila were together the entire time, her testimony that she simply did not see Pillette assault Siirlia would not help exonerate him.[8]

_____

[8]Invoking the concurrent sentence doctrine, Respondent insists that we can effectively decline review of this claim because Barrette's testimony does not even arguably relate to the Roby assault, which led to the longest of Pillette's concurrent sentences. We disagree. The concurrent sentence doctrine acts as a discretionary bar to judicial review, *see Benton v. Maryland*, 395 U.S. 784, 787–91 (1969), as it "allows appellate courts to decline to review a conviction carrying a concurrent sentence when one 'concurrent' conviction has been found valid." *Cheeks v. Gaetz*, 571 F.3d 680, 689 (7th Cir. 2009) (citing *United States v. Kimberlin*, 675 F.2d 866, 867 (7th Cir. 1982)). Our circuit "has been admittedly hesitant to apply this doctrine," invoking it only "when there is no possibility of 'adverse consequences' if the convictions stand." *Winn v. Renico*, 175 F. App'x 728, 732 (6th Cir. 2006) (citations omitted). The types of adverse consequence that can prevent the doctrine from applying include an effect on parole or a potential pardon, the existence of state recidivist statutes, the possibility of impeachment at a future trial, the potential for use as evidence of a prior bad act, and possible stigma. *See United States v. Vargas*, 615 F.2d 952, 959–60 (2d Cir. 1980); *see also Sanders v. Sullivan*, 863 F.2d 218, 226 n.8 (2d Cir. 1988) (applying *Vargas* analysis to review of habeas petition). Respondent makes no effort at all to demonstrate a lack of collateral consequences

Examination of Officer Crane's memorandum reveals that the district court read it incorrectly. The summary of Barrette's interview consists of four sentences. None of them indicates that Barrette and Siirila were together throughout the incident; indeed, the summary suggests quite the opposite. It states that after walking back to her trailer with Duckett, Barrette "began screaming, *then Melissa [Siirila] showed up* and screamed at her." Doc. 33-8 at 4 (emphasis added). This statement strongly implies that Barrette and Siirila were separated for a period of time between when the Pillette-Washington fight ended and when they reunited at the trailer. And in her deposition testimony, Barrette unequivocally stated that she and Siirila were not together the entire time after the fight broke out.[9] Doc. 45 at 13. This contradicts the district court's statement that Barrette and Siirila were together at the time of Siirila's alleged assault. Thus, from Pillette's perspective, the most Barrette could say in his favor was that she never saw Pillette with a gun and did not witness him threatening Siirila; her testimony comes nowhere close to absolving Pillette of the Siirila assault.

Moreover, Barrette's version of events contradicted Pillette's on at least two points, one of them highly important, and thus, as with Duckett, suggesting counsel made an informed strategic choice not to call her to testify. Fundamental to Pillette's account of the evening was his contention that Washington did not fight him alone, but that Washington, Roby, and Bell, acting in concert,

_____

attaching to Pillette's convictions, so we decline to apply the concurrent sentence doctrine in this case.

[9]Barrette's testimony leaves little room for confusion on this point:
Q: And you weren't with Ms. Siirila the entire time after the fight broke out; is that right?
A: No, I was not. We were not friends.

"jumped" him. Barrette's testimony contradicted Pillette's, as she testified that Washington fought Pillette on his own. Doc. 45 at 5. Officer Crane's summary of Barrette's interview reflects that she told him the same version, describing the fight as "between Washington and Jessie." Doc. 33-8 at 4. Barrette also told Officer Crane that she heard only a single gun shot, not the multiple shots that Pillette and others reported. The prosecution provided Officer Crane's statement to Pillette's trial counsel in discovery, and it appeared in the file counsel produced in the federal proceedings. Accordingly, counsel possessed legitimate reasons for not calling Barrette to testify at trial. Pillette fails to rebut the presumption of reasonableness accorded counsel's actions, and thus fails to demonstrate that the failure to call Barrette amounted to ineffective assistance.

iii. Rick Duarte

The district court characterized Duarte's potential testimony as "important to petitioner's defense to rebut the prosecution witnesses" because the statement he provided police does not mention seeing Pillette with a gun and that he recalled hearing only a single gunshot. Dist. Ct. Merits Op., 630 F. Supp. 2d at 799.

Counsel's failure to call Duarte was neither objectively unreasonable performance nor prejudicial to the defense. Duarte's statement to police lacked significance. He stated that: Washington and Pillette fought, he started to go home, heard windows break, then a gun shot, and then the police arrived; nothing more. Doc. 26-2 at 5. In that statement, Duarte provided no information that would have materially aided the defense, and said two things that would have

contradicted Pillette's testimony—namely, that the fight involved only Washington and Pillette, and that he heard only one gunshot. Just as he could have done with Barrette, trial counsel could have reasonably decided not to call Duarte because his testimony would have damaged Pillette's credibility while doing nothing to advance the defense. Pillette fails to demonstrate that counsel performed ineffectively by failing to call Duarte. Similarly, he fails to show how such a failure, even if unreasonable, prejudiced the defense.

iv. Megan Kimbler

The district court viewed Kimbler as important to combat Brower's testimony about hearing the shotgun click while pointed at Roby. According to the district court, "Kimbler's testimony would have contradicted that of Brower, in that Kimbler *could have* testified that Brower was not in a position to hear what she testified to, because Brower was in Kimbler's house the entire time without an opportunity to observe what she testified to." Dist. Ct. Merits Op., 630 F. Supp. 2d at 799 (emphasis added).

As Respondent points out, however, speculation about what Kimbler "could have" testified to cannot establish that Pillette was prejudiced by counsel's failure to call her as a witness. The only evidence ever adduced about Kimbler's potential testimony derives from the statement she gave police on the night of the incident. Nowhere in that statement did Kimbler indicate that Brower was not in a position to hear the shotgun make a clicking sound. Although Kimbler might have testified exactly as the district court speculated and cast doubt on Brower's perception of the events, it is

equally possible that she would have confirmed Brower's account. The salient point is that nobody

knows what she would have said. Speculation cannot suffice to establish the requisite prejudice.

*See Bentley v. Motley*, 248 F. App'x 713, 717 (6th Cir. 2007) (citing *Baze v. Parker*, 371 F.3d 310,

322 (6th Cir. 2004)). This is particularly true where, as here, the district court granted Pillette an

evidentiary hearing and afforded him every opportunity to drum up any evidence available to support

his claim. *See Clinkscale v. Carter*, 375 F.3d 430, 447 (6th Cir. 2004) (McKeague, J., dissenting)

(addressing speculation by the majority regarding what a witness would have testified to,

highlighting the factual record as inadequate, and suggesting the propriety of ordering an evidentiary

hearing to resolve the doubt). Lacking evidence that calling Kimbler actually would have produced

the favorable testimony he hoped for, Pillette cannot establish either unreasonable performance or

prejudice, so his claim fails.

> v.      Anthony Kuzia

In his petition, Pillette also identified Kuzia as a witness whom counsel should have called

at trial. Although the district court did not expressly reject this claim, it did not rely on Kuzia's

potential testimony in granting relief, so we touch on it here only briefly to note its complete lack

of merit. As Respondent explains (*see* Resp. Br. at 35–36), counsel's decision not to call Kuzia

vividly illustrates the reasonableness of counsel's decisionmaking. Unlike the other witnesses

Pillette claims his counsel should have called, Kuzia actually witnessed many of the critical events

leading to Pillette's convictions, particularly the assault on Roby, because he was present in the

trailer with Pillette after the fight with Washington ended. Kuzia gave two statements to police. He told Deputy Cavanaugh that Roby came into the trailer, Pillette pointed the shotgun at him, and it made a click. Doc. 76 at 38. And he told Officer Crane the same thing. *Id.* at 40. Pillette nevertheless asserted, both in his motion for reconsideration to the Michigan Court of Appeals and in his federal habeas petition, that trial counsel rendered constitutionally ineffective assistance by failing to call Kuzia to testify. But presenting Kuzia's inculpatory testimony—particularly where the prosecution did not—likely would have been both an unreasonable decision and prejudicial to the defense.

For the reasons explained, Pillette's ineffective assistance of counsel claim premised on counsel's failure to call witnesses fails because he cannot satisfy either prong of the *Strickland* analysis. Counsel did not act unreasonably in failing to call witnesses, and, in any event, Pillette cannot demonstrate prejudice.

B. Police Report Regarding Stolen .22 Caliber Firearm

Parroting the district court's holding, Pillette argues that trial counsel performed ineffectively by failing to introduce evidence (in the form of a police report) that a .22 caliber weapon was stolen from Pillette's trailer the night of the incident. In finding that this failure amounted to ineffective assistance, the district court explained:

> The failure to investigate a police report that would corroborate a defendant's testimony constitutes the ineffective assistance of counsel. *See Espinal v. Bennett*,

> 588 F. Supp. 2d 388, 401 (E.D.N.Y. 2008).  In the present case[,] [t]he police report could have provided corroboration to petitioner's story that his .22 caliber gun was stolen on the night in question, so as to support his theory that the other .22 caliber bullets that were found in the trailer park were fired by someone else, not him.

Dist. Ct. Merits Op., 630 F. Supp. 2d at 801.

For starters, it is unclear what the district court believed the police report showed.  Before it reached its conclusion, the court noted that Pillette's counsel—whose shoddy memory of this case pervaded the evidentiary hearing—"testified that Petitioner reported *the .22 caliber rifle* missing on December 23, 2003, some three months after the preliminary examination in this case."  *Id.* (emphasis added).  But contrary to what this statement implies—that the weapon allegedly stolen on the night of the incident was the .22 rifle—the police report itself, as well as Pillette's own characterization of it in his petition, clearly indicate that the stolen weapon was a .22 caliber two-shot Deringer pistol.  *See* Pet., Doc. 1-2 at 44; Ex. ii.

Pillette admitted in his own testimony that he possessed the .22 rifle and used it to fire the warning shot; the defense simply never took the position that the .22 rifle had been stolen such that the witnesses who testified to seeing him with it must have been lying.  Thus, introducing the police report would have further undermined Pillette's credibility, while doing nothing to advance his defense.  As for the assault on Roby, the witnesses to that crime—Roby and Brower—both testified that it involved the shotgun, not the .22.  With respect to Siirila, although the record is less clear as to which weapon Pillette used to threaten her (in her testimony, she called the weapon "a long gun"),

Pillette never argued that he could not have threatened Siirila because the gun he allegedly used to do it had been stolen. And while Pillette presented a vague "self-defense" theory,[10] suggesting that he acted the way he did (which even in his version included wielding the baseball bat and firing the warning shot with the .22 rifle) out of fear for his safety after being beaten in an unevenly-matched brawl, he never suggested that any of his victims was armed.

Nor did Pillette present a theory that "the other .22 caliber bullets that were found in the trailer park were fired by someone else, not him." Dist. Ct. Merits Op., 630 F. Supp. 2d at 801. The police recovered only a single shell casing from the scene, and it came from a .22. Pillette testified that he used the .22 to fire a single warning shot. The prosecutor discussed the shell casing with Pillette during his cross-examination, and Pillette acknowledged that it must have come from the warning shot he fired. Contrary to the district court's statement, there was no testimony about other .22 caliber bullets being recovered from the trailer park. But even if there had been, the police report about the stolen gun would remain irrelevant for the simple reason that the charges against Pillette had nothing to do with firing a gun. The most the police report could have accomplished for the defense would have been to supply an explanation for the testimony from several witnesses about hearing multiple gunshots. But the question of where the gunshots came from and who fired them

---

[10]Although the district court referred to Pillette's "self-defense" theory, Dist. Ct. Merits Op., 630 F. Supp. 2d at 801, with the possible exception of the felonious assault charge stemming from his swinging the baseball bat at Washington, Pillette did not argue self-defense. Rather, he insisted simply that he did not do the things the prosecution alleged. He certainly never argued that he reasonably perceived a threat of imminent harm from either Roby or Siirila, much less that assaulting them with a shotgun was a reasonable reaction to such a threat.

played no part in the conviction offenses—assaulting Roby and Siirila with a gun and Washington

with a baseball bat. None of the assaults produced a single gunshot, so even if Pillette had presented

the "theory" the district court suggests, neither the theory nor the police report that purportedly

bolstered it would have helped him defend against the crimes actually charged.

Moreover, had Pillette argued this supposed "theory," his counsel would not have been

ineffective for failing to introduce the police report as support. As Respondent explains in its brief,

the police report does not establish the theft of a gun from Pillette's trailer on the night of August

31, 2003. What the report actually says is that on December 22, 2003, someone named James Allen

Burbo reported the theft of a .22 caliber, two-shot Deringer pistol from the trailer occupied by

Pillette and Kuzia. The report places the date of the theft at some point between August 1, 2003, and

September 30, 2003; the incident in this case occurred right in the middle of this period, on August

31, 2003. The record contains absolutely no evidence linking Burbo or his gun to the events that led

to the charges against Pillette. Pillette's trial included no pertinent testimony concerning this pistol.[11]

In sum, far from demonstrating counsel's ineffectiveness, the police report bears no relationship to

the case.

---

[11]In his trial testimony, Pillette mentioned the theft of a .22 handgun in passing. The jury followed up on this by asking whether the existence of the gun had been established or whether it had been found. Officer Cavanaugh was recalled to answer the question, and responded that no .22 handgun had ever been found, that Kuzia (the owner of the other guns) never mentioned it, nor did any of the witnesses in the case. Nothing in the report contradicts Cavanaugh's response or explains why the court should have attached any significance to the .22 handgun.

Finally, the sole authority relied upon by the district court in this portion of its opinion is easily distinguished. In *Espinal*, a New York district court held that "an existing trial strategy, even if initially reasonable, cannot excuse counsel's failure to investigate new evidence that could potentially exonerate his client or create reasonable doubt in the minds of the jury." 588 F. Supp. 2d at 401. Here, counsel did not introduce the police report because it lacked relevance to the issues in the case. As explained, nothing about the police report held any potential to exonerate Pillette or to plant the seeds of reasonable doubt. The report placed the theft within a sixty-day range, half of which post-dated the offenses in this case. More importantly, none of the testimony or defense theories presented at trial would have been materially affected by evidence of the gun's theft on the night of the incident. Accordingly, the district court erred in finding that counsel's failure to present the report demonstrated constitutionally ineffective assistance.

C.      Impeachment of Roby With Prior Convictions

Respondent also challenges the district court's holding that counsel performed deficiently by failing to impeach Roby with evidence of two prior convictions: one for receiving a stolen firearm, the other for malicious destruction of property under $200. The district court found that "[t]his evidence could have been used to bolster petitioner's defense that he acted in self-defense, as well as his defense that someone else fired the additional bullets that were recovered from the trailer park." Dist. Ct. Merits Op., 630 F. Supp. 2d at 802.

Only the stolen firearm conviction was arguably admissible for impeachment purposes; the malicious destruction of property conviction was a misdemeanor not involving an element of theft, *see* Mich. Comp. Laws § 750.377a(c), and thus inadmissible under Michigan Rule of Evidence 609.[12] According to the documents, Roby's firearm conviction involved a nickel-plated handgun that belonged to his girlfriend's father. Roby apparently flashed the handgun in front of a group at the trailer park, and later shot a hole in the roof of his girlfriend's car. He was arrested and charged, eventually pleading guilty to one count of receiving and concealing a stolen firearm.

Pillette's trial counsel did not act unreasonably in failing to use the stolen firearm conviction to impeach Roby, nor did the failure prejudice Pillette's defense. The conviction held little usefulness as an impeachment tool, given that it did not involve an element of dishonesty or false statement. It only arguably qualifies for admission because the offense involved an element of theft, but the circumstances of the theft—the gun belonged to Roby's girlfriend's father and had not been reported stolen—lessen its impact for impeachment purposes. In any event, counsel's cross-examination of Roby focused on much more fertile ground and achieved productive results. Counsel forced Roby to admit that he "didn't see Jessie do anything with the gun, like pull the trigger," and

---

[12]The district court apparently thought the malicious destruction of property conviction could come in under Michigan Rule of Evidence 404(a)(2) as a "pertinent trait" of the victim, but the case it relied on for that proposition, *People v. Anderson*, 383 N.W.2d 186 (Mich. App. 1985), is inapposite. *Anderson* had nothing to do with the use of a prior conviction for impeachment purposes, but instead dealt with the admissibility of evidence of a victim's violent character to shed light on whether a killing was intentional or accidental. *Id.* at 188. Roby's conviction for malicious destruction of property does not in any way evince a violent character or any other potentially relevant character trait. Nor, moreover, does it make any sense to label a prior conviction a character "trait" to allow circumvention of Michigan Rule of Evidence 609.

that Pillette was not armed while walking around the trailer park with Kuzia. Roby also conceded that he broke windows in Pillette's trailer. Importantly, given Roby's admission that he didn't see Pillette pull the trigger, Roby's credibility was not a key issue at trial; the testimony that doomed Pillette as to the Roby assault came from Brower, not Roby. Under the circumstances, counsel had little to gain by attempting to impeach Roby with the prior conviction. Viewed as a whole, and indulging the presumption of reasonableness, counsel's examination of Roby did not fall below the standards of constitutionally adequate representation. Nor did the failure to introduce evidence of Roby's prior conviction prejudice the defense, since it held little impeachment value, and, in any event, the jury could have disbelieved the entirety of Roby's testimony and still convicted Pillette of the assault with intent to murder based upon Brower's account. Accordingly, Pillette's ineffective assistance claim relating to the failure to impeach Roby with his prior convictions lacks merit, and the district court's issuance of the writ on this basis therefore warrants reversal.

V.

After the 90-day period specified in the conditional writ expired and the state released Pillette from custody, the district court issued an unconditional writ and barred the state from re-prosecuting him. Because, as explained above, we find that the district court granted the writ in error, the order barring re-prosecution—which was necessarily predicated on the issuance of a valid writ—must also be reversed.[13]

---

[13]We do not address the question of the district court's jurisdiction to bar re-prosecution as it is unnecessary in view of our reversal of the grant of the writ.

VI.

For these reasons, we affirm the denial of relief on Pillette's Fifth Amendment *Miranda* claim and Sixth Amendment Confrontation Clause claim, and reverse the grant of relief on Pillette's ineffective assistance claim.  And because the district court erred in granting the writ, we also reverse its order barring re-prosecution.

**KAREN NELSON MOORE, Circuit Judge, dissenting**. Unlike the majority, I conclude that the prosecutor clearly erred in using Pillette's post-*Miranda* silence during his cross-examination and that the Michigan Court of Appeals's conclusion to the contrary was an unreasonable application of federal law. Therefore, I respectfully dissent.

"[T]he use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Doyle v. Ohio*, 426 U.S. 610, 619 (1976). Here, during Pillette's cross-examination, the prosecutor repeatedly focused upon Pillette's failure to provide the police with certain information and did so in a manner that was clearly and unabashedly aimed at encouraging the jury to infer guilt from silence. For instance, one exchange between the prosecutor and Pillette proceeded as follows:

[Prosecutor:] Okay. How'd the shotgun get out?
[Pillette:] Tony. Tony loaded it and put the barrel on it.
Q: Tony loaded it.
A: Yes.
Q: Put the barrel on it.
A: Yes, sir.
Q: Is that what you told the police?
A: I didn't tell the police anything.
Q: *Wait a minute. You had a chance to tell the police your side of the story and you didn't tell them anything?*
A: Yes, sir.

Doc. 11-13 (Trial Tr. (1/21/2004) at 189) (emphasis added). In another instance, the prosecutor asked Pillette: "If . . . all you're planning on doing is telling the truth, then why didn't you make a statement to the police." Trial Tr. at 209; *see also* Trial Tr. at 200 (Prosecutor: ". . . this is the first time that anybody's ever heard this story?"), 218 (Prosecutor: ". . . why is it that you just told us that now?"). Comments such as these are paradigmatic examples of precisely the kind of questioning that *Doyle* sought to prohibit.

The majority responds by suggesting that *Doyle* applies only when a defendant "invoke[s] his right to remain silent." Maj. Op. at 13. Invoking the right to remain silent is not a prerequisite to a *Doyle* claim, however. *See United States v. Caruto*, 532 F.3d 822, 831 (9th Cir. 2008) ("Even in non-invocation cases . . . mere omissions are not enough to justify cross-examination or argument regarding what was not said at the time of arrest."). Invocation bears on whether the officers interrogating a suspect are aware that the suspect wishes to remain silent and know when to cease their questioning. *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259–60 (2010). A *Doyle* violation, by contrast, involves a scenario in which a defendant is not challenging the questions asked by the interrogating officers or seeking to suppress the answers he gave in response to those questions, but rather argues that he is being punished for remaining silent.

The Supreme Court's decision in *Anderson v. Charles*, 447 U.S. 404 (1980), is not to the contrary. Under *Anderson*, the mere fact that a defendant made some post-*Miranda* statements to the police is not itself dispositive. *Anderson* never suggested that *Doyle* was inapplicable whenever

- 37 -

a defendant chooses to speak; it simply held that "*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements." *Anderson*, 447 U.S. at 408. The critical question is whether the prosecutor's comments at trial were "designed to draw meaning from silence," which is constitutionally prohibited, or were an attempt to "elicit an explanation for a prior inconsistent statement." *Id.* at 409. Thus, in order for a prosecutor to be permitted to refer to a defendant's post-*Miranda* silence, there usually must be some inconsistency between the defendant's testimony and the statements he made to the police. *See Caruto*, 532 F.3d at 831 (explaining that an inconsistency between the defendant's post-*Miranda* statements and his trial testimony is key in determining whether there was a *Doyle* violation); *United States v. Casamento*, 887 F.2d 1141, 1179 (2d Cir. 1989), *cert. denied*, 493 U.S. 1081 (1990) ("[F]or purposes of analysis under *Doyle*, even if a defendant has made statements to the police after receiving *Miranda* warnings, he is deemed to have maintained his silence, unless the post-arrest statements are inconsistent with the defendant's testimony at trial."); *see also Gravely v. Mills*, 87 F.3d 779, 787 (6th Cir. 1996) (holding that there was a *Doyle* violation when the "prosecutor's cross-examination . . . went far beyond calling the jury's attention to [an] inconsistency."). Furthermore, even if a defendant's testimony is inconsistent with his post-*Miranda* statements, the prosecutor's comments must actually be aimed at exposing that inconsistency. Otherwise, a prosecutor cannot be said to be "elicit[ing] an explanation for a prior inconsistent statement." *Anderson*, 447 U.S. at 409; *Gravely*, 87 F.3d at 787.

Nothing in *Anderson* provides otherwise. Although *Anderson* did state that "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent," it

explained that such a defendant "has not remained silent" only "[a]s to the subject matter of his statements," *Anderson*, 447 U.S. at 408, and accordingly, a prosecutor may probe inconsistencies between those statements and trial testimony. The invocation requirement that the majority seeks to draw from *Anderson* goes well beyond that decision's limited holding.

The majority points to the inconsistency between Pillette's testimony that he "didn't tell the police anything" and his admission that he made certain statements to the police, such as his telling them that he "didn't point a gun at nobody and didn't shoot a gun at nobody." Doc. 11-13 (Trial Tr. (1/21/2004) at 191) (internal quotation marks omitted). Although the prosecutor may have been permitted to explore this inconsistency, there is no indication that its questioning had such a focus. The prosecutor's questioning with respect to Pillette's silence was focused upon the information that Pillette consistently acknowledged not providing when he was arrested. Furthermore, the prosecutor's emphasis upon Pillette's failure to tell his "side of the story," Trial Tr. at 189, suggests that the prosecutor was more interested in the negative implications of silence itself than it was in any perceived inconsistency. Therefore, the prosecutor's questioning could only have been an attempt to "draw meaning from silence," *Anderson*, 447 U.S. at 409, which is precisely what *Doyle* forbids.

I also have reservations with respect to the majority opinion's analysis of Pillette's claims of ineffective assistance of counsel. Because I think the above-described *Doyle* errors by themselves

warrant habeas relief, however, I see no need to address this ineffectiveness issue at this time.  I

respectfully dissent.